# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. _____ |
| | : | |
| v. | : | Violation: |
| | : | |
| | : | 18 U.S.C. § 371 (Conspiracy) |
| **WALTER CRUMMY,** | : | |
| | : | Forfeiture: |
| | : | 18 U.S.C. § 981(a); 28 U.S.C. § 2461(c) |
| **Defendant.** | : | 21 U.S.C. § 853(p) |

## INFORMATION

The United States charges that:

### COUNT ONE - CONSPIRACY

At various times relevant to this Information:

#### Introduction

1. At all relevant times, MCC Construction Corporation ("MCC") was a construction management company and a general contractor that provided design/build, renovation/restoration, and new construction services. It was founded in 1986, and its home office was located in Greenwood Village, Colorado, with regional offices in different parts of the country. MCC was actively managed by Walter Crummy ("Defendant"), Thomas Harper ("Harper"), Person D, and Person F, who were all owners of MCC.

2. At all relevant times, Company 1 purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry. At all relevant times, Company 1 was certified to participate in the Small Business Administration's

("SBA") 8(a) program and was headquartered in Illinois. Company 1's primary business address was the home address of relatives of Person A. For portions of the relevant period, Company 1 was also certified to participate in the Historically Underutilized Business Zone ("HUBZone") program.

4. At all relevant times, Defendant was an officer of MCC—holding, at various times, the titles of Controller and CFO—and one of the owners of the company. He played no role in project delivery.

5. At all relevant times, Harper was an officer of MCC and one of the owners of the company.

6. At all relevant times, Person A resided in Illinois. Person A was president of Company 1.

7. At all relevant times, Person D was an officer of MCC and one of the owners of the company.

8. For portions of the relevant period, Person F was an officer of MCC and one of the owners of the company.

9. At all relevant times, the email communications sent in furtherance of this scheme were transmitted in interstate commerce.

## The Conspiracy and Its Objects

10. From at least on or about December 24, 2009, through in or around August 2013, in the District of Columbia and elsewhere, the Defendant,

**WALTER CRUMMY**

and others unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed with one another and with others to commit offenses against the United States, that is, to

knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing they were false and fraudulent when made, and for the purpose of executing such scheme and artifice and attempting so to do, did cause to be sent and delivered interstate wire communications, in violation of Title 18, United States Code, Section 1343.

### Goal of the Conspiracy

11. The goal of the conspiracy was for Defendant, MCC, Company 1, and others to enrich themselves by engaging in a conspiracy and a scheme to defraud in which they obtained funds from the United States, and an agency thereof, by means of false and fraudulent pretenses, representations, and promises.

### Manner and Means of the Conspiracy

12. Defendant, MCC, Company 1, and others used the following manner and means, among others, to accomplish the objects and goal of the conspiracy:

    a. MCC partnered with Company 1 to gain access to contracts that were awarded through the SBA's 8(a) program. To qualify for the 8(a) program, a business must be at least 51 percent owned and controlled by a U.S. citizen (or citizens) of good character who meet the SBA's definition of socially and economically disadvantaged. For construction contracts, the 8(a) business must perform at least 15 percent of the cost of the contract with its own employees (not including the cost of materials).

    b. MCC partnered with Company 1 to gain access to contracts that were awarded through the HUBZone program. To qualify for the HUBZone program, a company must establish that: i) it is a small business; ii) it maintains a principal office located within an

area that has been designated as a HUBZone; and iii) at least 35 percent of its employees reside within designated HUBZone areas. For construction contracts, the HUBZone business must perform, at least, 15 percent of the cost of contract performance incurred for personnel on the HUBZone company's employees.

   c. MCC, Company 1, and others concealed the fact that MCC, which was not eligible for the aforementioned SBA contracting preferences, exercised impermissible control over Company 1's bidding for and performance of Company 1's contracts.

   d. Defendant, MCC, Company 1, and others agreed that Company 1 would furnish all labor, equipment material safety, and supervision for contracts that Company 1 subcontracted to MCC.

   f. Defendant, MCC, Company 1, and others agreed that for each government contract that Company 1 subcontracted to MCC, Company 1 would award MCC 97 percent of the value of the contract.

   h. MCC, Company 1, and others concealed the fact that, at all relevant times, Company 1 was not performing, at least, 15 percent of the cost of the contract with their own employees.

   i. MCC, Company 1, and others misrepresented that Company 1 was in compliance with SBA regulations pertaining to Company 1's contracts obtained through this scheme, including that Company employees had performed the required percentage of work on those contracts.

## OVERT ACTS

13. Within the District of Columbia and elsewhere, in furtherance of the above-described conspiracy and in order to carry out the objects thereof, Defendant, MCC, Company 1, and others committed the following overt acts, among others:

    a.    On or about January 19, 2010, Defendant prepared, as instructed by Harper following Harper's negotiations with Person A, and circulated, via email, to Harper, Person D, and Person F a proposed addendum that would be applied to existing profit and cost reimbursement agreements for two contracts already obtained by MCC and Company 1. The proposed addendum included the following provisions:

> 3. Upon award of each and every task order under the Contract by the Government to [Company 1], [Company 1] will award a subcontract for that task order in the amount of 97% of the amount of that task order to MCC.
>
> 4. MCC will furnish all labor, equipment, material safety and supervision to perform the respective scope of work of the task order.
>
> . . . .
>
> 6. Upon agreement with MCC, if [Company 1] executes a subcontract directly with a subcontractor for a portion of the scope of work of a specific task order, then [Company 1] will deduct that amount from its subcontract agreement with MCC however MCC will continue to be responsible for the supervision of that subcontractor unless another written agreement is executed.
>
> 7. MCC will pay all site overhead costs . . .

    b.    In and around February 2010, these addendums were executed. Defendant was aware that these principles—that MCC would provide all labor, equipment, material safety and supervision and receive 97 percent of the task order amount—would become the operating

5

principles for contracts that Company 1 subsequently obtained and subcontracted to MCC. Under this arrangement, Company 1 lent its name and small-business status and MCC bore nearly all of the expenses of actually fulfilling these contracts. The agreement, by its terms, meant that Company 1 would be violating the requirement that it perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

    c.    After Defendant knowingly and voluntarily joined the scheme, MCC obtained the following contracts through Company 1:

| Award Recipient | Contract Name | Contract Number | Award Date | Date Complete | MCC Revenue |
|---|---|---|---|---|---|
| Company 1 | Coast Guard – North | HSCGG-110-D-PRV057 | 8/6/10 | 9/30/11 | $842,482 |
| Company 1 | Coast Guard – South | HSCG-821-D-PMVA39 | 2/9/11 | 1/31/13 | $788,895 |
| | | | | **Total:** | **$1,631,377** |

Each of these contracts resulted in a loss to MCC.

    d.    Between on or about December 24, 2009, and in or around August 2013, Company 1 provided no substantive services in connection with these contracts. Instead, Company 1 subcontracted these contracts in their entirety to MCC, played no substantive role in project delivery, and collected an approximately three percent fee for allowing their small business status to be used.

    14.    As a result of the scheme described above, Defendant willingly and knowingly defrauded the United States government into awarding, at least, $1,631,377 in contracts that were intended to be awarded to valid 8(a) or HUBZone firms.

    15.    The percentage of Defendant's compensation from MCC that is attributable to the $1,631,377 in contracts awarded after December 24, 2009, is, at least, $105,618.

**(Conspiracy to Commit Wire Fraud, in Violation of Title 18, United States Code, Sections 371 and 1343.)**

## FORFEITURE ALLEGATION

1. Upon conviction of the offense alleged in Count One, the Defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment against the Defendant in the amount of $105,618.

2. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the Defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property that cannot be divided without difficulty;

the Defendant shall forfeit to the United States any other property of the Defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

CHANNING D. PHILLIPS
United States Attorney
Bar No. 415793

By: *(signature)*

MATT GRAVES
Bar No. DC - 481052
Assistant United States Attorneys
Fraud & Public Corruption Section
555 4th Street, N.W., Room 5227
Washington, DC 20530
202-252-7762

LISA M. PHELAN
Chief
Washington Criminal I
Antitrust Division:

*(signature)*

KEVIN HART
JUSTIN P. MURPHY
Trial Attorneys
Washington Criminal I
Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 11300
Washington, D.C. 20530