IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 16-133 |
| | : | |
| v. | : | |
| | : | **FILED** |
| WALTER CRUMMY, | : | AUG 2 3 2016 |
| | : | Clerk, U.S. District & Bankruptcy |
| Defendant. | : | Courts for the District of Columbia |

## STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant Walter Crummy, agrees and stipulates as follows:

### Relevant Law

1. The "8(a) program" is a program administered by the Small Business Administration ("SBA"), a department and agency of the United States. The program is named for Section 8(a) of the Small Business Act and is a development program that was created to help small, disadvantaged businesses compete in the American economy and access the federal procurement market. To qualify for the 8(a) program, a business (commonly referred to by the SBA and other government agencies as the "firm") must be at least 51 percent owned and controlled by a U.S. citizen (or citizens) of good character who meet the SBA's definition of socially and economically disadvantaged. The firm also must be a small business (as defined by the SBA) and show a reasonable potential for success.

2. The SBA's 8(a) program exists, among other reasons, to facilitate the economic development of competitive small businesses that contribute to the overall health of the U.S. economy. The program also exists to ensure that large corporations do not gain monopoly

positions with respect to U.S. government contracting. The SBA's 8(a) program furthers the additional goal of developing competitive small businesses owned by historically disadvantaged socioeconomic groups. The U.S. government agencies that award 8(a) contracts further these goals by, among other things, awarding contracts on either a set-aside basis, where the only competitive bidding is among similarly eligible firms, or on a sole-source basis, without competitive bidding. In doing so, those agencies further the congressional intent of the 8(a) program by ensuring that 8(a) firms (and not other, ineligible firms) receive the benefit of the profits from the awarded contracts and the benefit of performing the volume of business from those contracts.

3. As a prerequisite to participation in the 8(a) program and to further payment under any government contracts subsequently awarded through that program, a firm must apply and qualify for participation in the 8(a) program through a formal SBA-administered application process. In addition, all 8(a) firms must submit annual reviews that the SBA uses to monitor eligibility. Firms can remain in the 8(a) program for up to nine years provided they maintain that eligibility, at which point the SBA considers a firm to have "graduated" from the 8(a) program. Once a small business graduates from the program, it is no longer eligible to obtain government contracts reserved for Section 8(a) program participants.

4. The SBA can revoke a firm's 8(a) status during that nine-year term by "graduating" it early if the agency determines that it no longer meets the criteria for certification. SBA regulations require firms to inform the SBA of any changes that would adversely affect program eligibility while they are participating in the 8(a) program. The SBA also may terminate a firm from the 8(a) program for good cause, such as submission of false information or failure to maintain eligibility requirements. After a firm loses its 8(a) eligibility, it cannot

reapply, even if it changes its name or management. Similarly, after a firm loses 8(a) status, the disadvantaged individual upon whom eligibility was based is no longer eligible to qualify with another firm.

5. Participants in the 8(a) program are subject to regulatory and contractual limits on subcontracting work from 8(a) set-aside contracts. The SBA regulations require, among other things, the 8(a) company to agree that on construction contracts it "will perform at least 15 percent of the cost of the contract with its own employees (not including the costs of materials)." 13 C.F.R. § 125.6(a)(3). Likewise, the Federal Acquisition Regulation (FAR) requires all contracting officers for the Government to include a clause in 8(a) set-aside contracts, which recites the applicable restriction on subcontracting. 48 C.F.R. § 19.811–3 (requiring contract officers to put clause 52.219–14, Limitations on Subcontracting, in any solicitation and contract arising from 8(a) contracting). Clause 52.219–14 reads, in pertinent part, "[b]y submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for . . . general construction the concern will perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees." 48 C.F.R. § 52.219–14(c). The limitation on subcontracting is both a regulatory and contractual requirement for contractors to receive the benefits of the 8(a) Program.

6. The SBA also administers the Historically Underutilized Business Zone ("HUBZone") program. To qualify for the HUBZone program, a company must establish that: i) it is a small business; ii) it maintains a principal office located within an area that has been designated as a HUBZone; and iii) at least 35% of its employees reside within designated HUBZone areas. 13 C.F.R. § 126. A company that applies for, and is granted, HUBZone status by the SBA qualifies to receive federal government contracts that are set aside for certified

3

HUBZone companies. A HUBZone-certified company is obligated to immediately inform the SBA of any material changes in its status. Such changes would include a change in ownership, a change in primary business address, a change in business structure, or a change in the company's compliance with the 35% residency requirement. For construction contracts, the HUBZone business must perform, at least, 15% of the cost of contract performance incurred for personnel on the HUBZone company's employees.

### Background

7. MCC Construction Corporation ("MCC") was a construction management company and a general contractor that provided design/build, renovation/restoration, and new construction services. It was founded in 1986, and its home office was located in Greenwood Village, Colorado, with regional offices in different parts of the country. MCC was actively managed by Crummy, Thomas Harper, Person D, and Person F who were owners of MCC.

8. Company 1 purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry. At all relevant times, Company 1 was certified to participate in the 8(a) program and was headquartered in Illinois. Company 1's primary business address was the home address of relatives of Person A. For portions of the relevant period, Company 1 was also certified to participate in the HUBZone program.

9. Company 2 purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry. At all relevant times, Company 2 was certified to participate in the 8(a) program. Company 2 routinely used Company 1's business address as one of its addresses.

10. At all relevant times, Crummy was an officer of MCC—holding, at various times, the titles of Controller and CFO—and one of the owners of the company. He played no role in project delivery.

11. At all relevant times, Harper was an officer of MCC and one of the owners of the company.

12. At all relevant times, Person A resided in Illinois. At various times throughout the relevant period, Person A held officer positions with Company 1 and Company 2.

13. At all relevant times, Person D was an officer of MCC and one of the owners of the company.

14. For portions of the relevant period, Person F was an officer of MCC and one of the owners of the company.

15. At all relevant times, the email communications sent in furtherance of this scheme were transmitted in interstate commerce.

## Overview of the Scheme at MCC

16. MCC executed and caused to be executed a scheme and artifice to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing they were false and fraudulent when made, and for the purpose of executing such scheme and artifice and attempting so to do, did cause to be sent and delivered interstate wire communications.

17. MCC engaged in and executed a scheme from, at least, in or around January 2008, through in or around August 2013, to defraud a number of government agencies, including the SBA; the General Services Administration ("GSA"); U.S. Army, Mission and Installation Contracting Command; U.S. Navy, Naval Facilities Engineering Command; U.S. Air Force, Air

Force Material Command; U.S. Department of Commerce; U.S. Coast Guard, Civil Engineering Unit; U.S. Army Corps of Engineers; U.S. Fish and Wildlife Service; and U.S. Property and Fiscal Office for California by, among other things: (i) operating Company 1 and Company 2 as entities with titled owners over whom MCC exerted impermissible control; (ii) concealing that MCC, which was not eligible for the aforementioned SBA contracting preferences, exercised impermissible control over Company 1 and Company 2; (iii) causing misrepresentations that Company 1 and Company 2 were in compliance with SBA regulations pertaining to Company 1's and Company 2's contracts, including that Company 1 and Company 2 employees had performed the required percentage of work on those contracts; (iv) engaging in deceptive practices to make it appear that MCC employees were actually employees of Company 1 and Company 2; and (v) obtaining, at least, approximately $70,274,894 in U.S. government contracts as a result of false and misleading conduct.

18.     As described in greater detail below, MCC participated in the scheme described above to obtain U.S. government contracts based on SBA-administered contracting preferences to which MCC was not entitled, and MCC did so for the purpose of enabling MCC and others to benefit improperly from the payments received in relation to those contracts, the volume of business performed pursuant to those contracts, and the expected future gain from performing those contracts.

19.     On or about December 24, 2009, Crummy knowingly and voluntarily began participating in the fraudulent scheme as it was executed by MCC and Company 1.

## **Criminal Conduct**

*Crummy Understood that MCC and Company 1 Partnered on Contracts and that these Contracts Were Governed by SBA Rules and Regulations*

20.  In and around February 2008, Person D, on behalf of MCC, and Company 1 signed a teaming agreement related to the first of the approximately $56 million worth of contracts obtained through this scheme. According to the terms of the agreement, which had been reviewed and approved by MCC's external legal counsel, Company 1 was responsible for contract delivery efforts and there was supposed to be clear delineations of responsibility between MCC and Company 1. For instance, the agreement required that Company 1 "prepare the competitive proposal, integrate the information provided by [MCC], and submit the competitive proposal to the [contracting agency]." If a contract was awarded, Company 1 was to "[s]upply, as salaried employees, the contract manager and quality control staff with assistance of [MCC]." The agreement also made clear that, with limited exception, "neither Party will be liable to the other for any costs, expenses, risks, or liabilities arising out of the other Party's participation in the preparation, submission, or sustaining of competitive proposals under the Solicitation." A number of these clear responsibilities were added to the teaming agreement by MCC's external legal counsel so that the teaming arrangement would comply with applicable SBA rules and regulations. MCC entered into similar teaming agreements on other contracts they jointly pursued.

21.  The SBA rules, regulations, and restrictions were known to Crummy, Harper, Person D, and Person F. On or about January 17, 2008—the day after MCC and Company 1 executed a reimbursement agreement—Person F emailed Crummy, Harper, and Person D guidance that discussed the "perils" and "pitfalls" of teaming agreements, addressing, among

7

other subjects, the fact that the prime contractor must have a defined role that allows it to meet its legal obligations. The guidance also noted that a "proposed subcontractor must not have a role in contract management, particularly, a role where subcontractor employees are the key personnel to interact with agency technical managers."

22. On or about September 23, 2008, an MCC employee forwarded to Crummy, Harper, Person D, and Person F a Department of Justice press release reporting criminal guilty pleas in connection with a scheme in which a small business used its preference to obtain contracts and then unlawfully passed those contracts and the revenue for the contracts to large companies in exchange for a small fixed fee. In the email forwarding the press release, the MCC employee wrote, "read the following by US Department of Justice—*some of it sounds really close to what MCC is doing*—my biggest concern also is—is MCC setting up accounts to receive payment from the government (control the account) if so I don't believe this would be legal?" (Emphasis Added.)

23. On or about November, 20, 2008, Company 1 and MCC implemented operating procedures that made Company 1 nothing more than a pass through for the contracts Company 1 subcontracted to MCC. These procedures were set up by Crummy and Person D. Crummy set up a bank account in the name of Company 1 to receive all payments from the government and then pay all related expenses and distribute profits. MCC and Company 1 had joint signatory authority over that account. Proposals sent to the government, however, caused payments to go to a bank account solely controlled by Company 1. On or about November, 20, 2008, a Company 1 contract specialist informed Harper that Company 1 just received a payment from the government of approximately $66,000 and asked Harper what Company 1 should do with

this payment and all other payments Company 1 received where MCC was the subcontractor. The following exchange occurred between and Harper and the contract specialist:

| | |
|---|---|
| Harper: | You send us the whole thing. |
| Company 1 Employee: | ok so just to confirm on every project with MCC we will pay the entire amount received in the bank account. . . . |
| Harper: | That's correct [Company 1 Employee], it will always be the entire amount. |

Later in the relationship, MCC sent invoices to Company 1 detailing the amount to be paid to MCC after funds were received from the government.

*Crummy, Harper, Person A, Person D, and Person F Received a Warning from the SBA that the Way in Which MCC and Company 1 Were Operating Violated SBA Rules and Regulations*

24.     On or about August 18, 2008, MCC, at Person F's direction, submitted a proposal that purported to be from Company 1 for a GSA solicitation related to a building in Boston ("the Boston Solicitation"). The proposal made numerous references to MCC and provided resumes for a number of the key personnel for the project which revealed that these individuals were MCC employees. Crummy was not involved in drafting this proposal for MCC.

25.     On or about November 17, 2008, a GSA contracting officer sent a letter to Person A, explaining that Company 1 was in the competitive range for the Boston Solicitation, but asking Company 1 to address weaknesses and deficiencies identified in the bid. Among other things, the contracting officer asked Person A to explain the relationship between Company 1 and MCC and to confirm that Company 1 would be able to meet the minimum work

requirements under the regulations—that is, performing at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

26. On or about November 18, 2008, Person A sent a letter to the GSA contracting officer affirming that Company 1 would meet the minimum work requirement if GSA awarded Company 1 the Boston Solicitation.

27. The November 18, 2008, letter did not satisfy the GSA contracting officer's concerns. On or about November 21, 2008, the contracting officer sent an email to Person A further questioning the nature of the relationship between MCC and Company 1.

28. On or about November 24, 2008, Person F sent an email to Crummy, Harper, and Person D, expressing concerns about the implications of an adverse ruling from a government agency on the relationship between MCC and Company 1. First, Person F recognized that an adverse decision seemed unavoidable, and noted that: "the outcome of any response we submit seems to be demonstrably clear—we are going to have a government agency tell us that our 'arrangement' fails to meet the definition of a small business and we are in fact affiliated." Second, Person F recognized that such a determination could have ramifications beyond the Boston Solicitation: "going forward this has the potential create [sic] some serious problems should we continue to pursue contracts under the this [sic] relationship. There are some obvious ethics rules that come in to play and I certainly don't want to be the one to tell any other agency/investigator that our relationship had been flagged on other solicitations." Person F concluded his email by recommending that MCC find a solution that avoided a ruling from the GSA:

> The point is this; why push a Government organization to make an official determination (most likely made by the SBA) when the outcome is preordained? By far the best approach would be not to respond at all. The issue disappears and we still have our virginity.

10

> Third base, hopefully, won't be part of the record and we can at least say with a straight face that we're virgins. If it too [sic] late, we're screwed already and it won't matter.

Although Crummy was copied on this email, Crummy did not play any role in deciding how MCC should respond to the SBA.

29. On or about December 19, 2008, GSA notified offerors that Company 1 was an apparent successful offeror for the Boston Solicitation. That same day, though, the GSA contracting officer filed a protest with the SBA, claiming that Company 1 was other than a small business for purposes of the Boston Solicitation because of the relationship between Company 1 and MCC.

30. On or about January 22, 2009, the SBA issued a determination, concluding, for purposes of the Boston Solicitation, that Company 1 was other than a small business. Among other things, the SBA noted, for purposes of this solicitation, that Company 1's "heavy reliance on MCC [was] patently clear" from Company 1's proposal; that every resume submitted with the proposal was an MCC employee, not a Company 1 employee; and that the proposal repeatedly identified MCC, not Company 1, personnel as the individuals who would be responsible for satisfying solicitation requirements. The SBA concluded that, for purposes of the Boston Solicitation, "Company 1's ability to perform depend[ed] heavily, if not entirely, on MCC's experience, expertise, and personnel."

31. In addition to concluding that Company 1 was other than a small business for purposes of the Boston Solicitation, the SBA also noted the contradiction between the materials submitted for the Boston Solicitation and Person A's and MCC's subsequent representations:

> This determination depends upon choosing between two contradictory presentations from [Company 1]: the proposal submitted to GSA in order to win the solicitation or subsequent e-

11

> mails sent . . . to explain its position. The two cannot be reconciled inasmuch as the proposal so clearly and unambiguously describes a team, complete with staffing decisions and clear lines of responsibility.

Crummy received a copy of the SBA's January 22, 2009, determination.

*Despite Awareness of the SBA Regulations, Crummy Joined the Criminal Conspiracy at MCC*

32.    Crummy ultimately voluntarily and knowingly participated in the fraudulent scheme orchestrated by MCC.

33.    By at least December 24, 2009, Crummy learned that Company 1 was not providing any labor on the projects on which MCC and Company 1 partnered. On December 24, 2009, Crummy, Harper, and Person D discussed, via email, a request from Person A that MCC treat the cost of Company 1's accountant as a cost for which MCC reimbursed Company 1. In proposing a strategy for dealing with Person A's request, Harper wrote to Crummy and Person D, "I really think [Person A] needs to consider the reality of the situation, *which in my opinion is us handing her large returns for no risk and no work*. This must of course be done carefully, since a very large and profitable part of our work in the NE is with [Person A]." (Emphasis Added.) In speculating about what prompted this request from Person A, Harper wrote, "[i]n the end the real issue is that they see good money coming our way and their share is reduced by having to pay an accountant and an admin to help count and track all of it. The pain of success, we all wish we didn't need those darn accountants."

34.    On or about January 19, 2010, Crummy, as instructed by Harper following Harper's negotiations with Person A, prepared and circulated to Harper, Person D, and Person F a proposed addendum that would be applied to existing profit and cost reimbursement

agreements for two contracts obtained through the scheme. The proposed addendum included the following provisions:

>   3.  Upon award of each and every task order under the Contract by the Government to [Company 1], [Company 1] will award a subcontract for that task order in the amount of 97% of the amount of that task order to MCC.
>
>   4.  MCC will furnish all labor, equipment, material safety and supervision to perform the respective scope of work of the task order.
>
>   . . . .
>
>   6.  Upon agreement with MCC, if [Company 1] executes a subcontract directly with a subcontractor for a portion of the scope of work of a specific task order, then [Company 1] will deduct that amount from its subcontract agreement with MCC however MCC will continue to be responsible for the supervision of that subcontractor unless another written agreement is executed.
>
>   7.  MCC will pay all site overhead costs . . .

In and around February 2010, these addendums were executed. Crummy was aware that these principles—that MCC would provide all labor, equipment, material safety and supervision and receive 97% of the task order amount—would become the operating principles for contracts that Company 1 subsequently obtained and subcontracted to MCC. Under this arrangement, Company 1 lent its name and small-business status and MCC bore nearly all of the expenses of actually fulfilling these contracts. The agreement, by its terms, meant that Company 1 would be violating the requirement that it perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

35. Moreover, when interacting with the government on behalf of Company 1 after December 24, 2009, Crummy used an email account that had Company 1's name in the domain

address. This email account included a signature block identifying Crummy as a Company 1 employee. By way of example, in and around April 2010, Crummy exchanged emails with the Defense Finance and Accounting Services (DFAS) about the status of payments to Company 1. In addition to the account information that created the false appearance that Crummy was a Company 1 employee, Crummy wrote the emails in a way that suggested that he was a Company 1 employee.

*Contracts Obtained After December 24, 2009*

36. After Crummy knowingly and voluntarily joined the scheme, MCC obtained the following contracts through Company 1:

| Award Recipient | Contract Name | Contract Number | Award Date | Date Complete | MCC Revenue |
|---|---|---|---|---|---|
| Company 1 | Coast Guard – North | HSCGG-110-D-PRV057 | 8/6/10 | 9/30/11 | $842,482 |
| Company 1 | Coast Guard – South | HSCG-821-D-PMVA39 | 2/9/11 | 1/31/13 | $788,895 |
| | | | | Total: | $1,631,377 |

37. With respect to the 8(a) and HUBZone contracts above, Company 1, in furtherance of its scheme with MCC, attested to procuring U.S. government agencies that it was an eligible SBA 8(a) firm, and MCC and Company 1 conspired to submit these false attestations with the intent that the procuring agencies would rely on the attestations in their respective award processes and in providing the listed payments. For the reasons set forth above, Company 1's representations in this regard were false because it was not a legitimate 8(a) or HUBZone firm and because MCC, which was an 8(a)- and HUBZone-ineligible entity for purposes of the contracts listed above, improperly exerted control over Company 1. The revenue MCC obtained

from the scheme with Company 1 constituted 18 percent of MCC's total revenue during the relevant period.

38.   By the terms of the MCC's agreements with Company 1, the two companies anticipated a 10 percent profit margin. Accordingly, for the two contracts referenced above, the anticipated profit was $163,137. Nevertheless, both contracts resulted in an actual loss to MCC.

*Crummy Salary and Bonus*

39.   From January 1, 2010, through the end of the relevant period, Crummy received from MCC the following salary and bonus:

|  | 2010 | 2011 | 2012 | Total |
| --- | --- | --- | --- | --- |
| **Total Salary** | $126,940 | $137,609 | $146,836 | $411,385 |
| **Total Bonus** | $102,234 | $63,153 | $10,000 | $175,387 |

Crummy's total salary and bonus from this period is $586,772. Eighteen percent of this amount would equal $105,618.

MATT GRAVES
Bar No. DC - 481052
United States Attorney's Office
District of Columbia
555 4th Street, N.W., 5th Floor
Washington, D.C.  20530

_____
LISA M. PHELAN
CRAIG Y. LEE
KEVIN HART
JUSTIN P. MURPHY
Washington Criminal I
Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 11300
Washington, D.C. 20530

## Defendant's Acceptance

I have read this Statement of the Offense and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

___8/23/16___  ___Walter Crummy___
Date  Walter Crummy
  Defendant

## Defense Counsel's Acknowledgment

I am defendant Walter Crummy's attorney. I have reviewed every part of this Statement of the Offense with my client. It accurately and completely sets forth the Statement of the Offense agreed to by the defendant, the Office of the United States Attorney for the District of Columbia, and the Antitrust Division.

___8-23-16___  _____
Date  Ralph Caccia